## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| OverDrive, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| OpenAI OpCo, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff OverDrive, Inc., by and through its attorneys, for its Complaint against Defendant OpenAI OpCo LLC ("***OpenAI***"), alleges as follows:

## PRELIMINARY STATEMENT

1.      Schools, teachers, and parents are voicing concern over a significant threat of harm to children. For the past seven-plus years, OverDrive's SORA® solution has successfully served pre-K-12 students by allowing them to access (at-no-cost to them) a controlled, managed collection of ebooks, audiobooks, read-alongs, and other digital content from their school's library. OpenAI's recently launched AI text-to-video generation software app under the exact same name, Sora, using a confusingly similar icon, color palette, and visual identity, infringes OverDrive's trademark rights and damages the integrity of the SORA brand, which is built on trust, safety, and educational value. If immediate steps are not taken to protect children from being confused between OverDrive's SORA app and OpenAI's Sora app, schools have indicated that they will have no choice but to take their own steps to do so—by discontinuing their use of OverDrive's SORA app and taking away a valuable tool that students, teachers, and staff have used to increase literacy through age-appropriate content. To date, OpenAI has been unwilling to heed well-grounded

concerns about the risk of confusion and harm to children. Thus, OverDrive respectfully seeks the assistance of this Court.

2.     This is an action for infringement of OverDrive's federally-registered SORA trademark under Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)), for unfair competition and false designation of origin under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), and for substantial and related claims of trademark infringement, unfair competition, and deceptive trade practices under the statutory and common laws of the State of Ohio, all arising from OpenAI's unauthorized use of the mark Sora in connection with the marketing, advertising, promotion, distribution, and/or rendering of OpenAI's text-to-video generation software goods and services.

3.     OverDrive is the leading supplier of digital access to ebooks, audiobooks, online magazines, streaming video titles, and other digital content, providing digital rights management and digital content fulfillment services for publishers, libraries, schools, corporations, non-profits, the government, the military, and book retailers. All over the world, local libraries offer millions of ebooks and audiobooks to their patrons using OverDrive's products and services to do so.

4.     Serving readers in more than 100 countries, OverDrive has partnered with thousands of libraries and schools to fuel a literacy campaign, delivering inclusive, equitable access to digital content. OverDrive's digital solutions support diverse languages and formats, ensuring that every reader—regardless of age, ability, or location—can find their next great read. Its commitment to literacy transcends borders, bridging gaps in education and opportunity.

5.     With SORA®, its leading electronic reading solution for schools and their associated libraries, OverDrive has redefined how students, teachers, and communities connect with literature, learning, and leisure. Through SORA, OverDrive facilitates pre-K-12 students'

- 2 -

access to and enjoyment of specifically selected and vetted, age-appropriate digital content, including ebooks, audiobooks, read-alongs, picture books, magazines, digital comics, graphic novels, and more, from their school library, as well as related goods and services.

6. With SORA, OverDrive's mission is, has been, and will continue to be that it gets the right book at the right time to the right student because access to that material at that point in time can and has been shown to impact that student's academic outcome.

7. The SORA solution is not limited to serving text-only content—it displays the full contents of works, including full-color illustrations, graphics, and other images, and provides access to authorized educational videos. The SORA solution includes read-along content and other accessibility-focused features that provide an audiovisual experience.

8. On February 15, 2024, almost exactly five and a half years after OverDrive first released SORA, the for-profit artificial intelligence behemoth OpenAI announced the development of a new text-to-video generation software application that would be named Sora,[1] having filed a federal application to register the trademark just the day before. OpenAI knowingly and willfully selected and adopted the name Sora for its new software application notwithstanding OverDrive's federal registration for the SORA trademark and OverDrive's longstanding widespread, continuous, and exclusive use of the trademark for its digital reading solution.

9. That same month, OverDrive's lawyers initiated discussions with OpenAI's lawyers, expressing concern about the likelihood of confusion between the parties' anticipated overlapping use of the SORA trademark. OverDrive's concerns were resoundingly rebuffed by OpenAI. Even as recently as the beginning of this year, OpenAI maintained that there was no

---

[1] Although both parties use the SORA trademark in the market as "Sora" (with an initial cap), for the sake of clarity, when referring to OverDrive's SORA in this Complaint, we use all caps, and when referring to OpenAI's Sora in this Complaint, we use an initial cap.

likelihood of confusion, pointing to OpenAI's use of Sora as merely a feature of its ubiquituous ChatGPT web-based software rather than as a standalone mobile app, and the different uses in the marketplace, namely, that OverDrive's use of SORA "is accompanied by a cartoon-style animated mascot" and OpenAI's Sora "has no mascot or independent logo," and "is not presented in a cartoon-y style." OpenAI's actions, however, tell a different story and have served to not only reinforce but *increase* OverDrive's concerns.

10.    Earlier this year, OpenAI's application to register the SORA trademark was issued a refusal by the US Patent and Trademark Office based on a likelihood of confusion with OverDrive's pre-existing SORA registration and one other pre-existing SORA registration owned by a third party. While OpenAI was able to overcome the refusal, OverDrive has opposed OpenAI's application before the US Trademark Trial and Appeal Board. The opposition is currently pending.

11.    Within just the past two months alone, OpenAI launched Sora as a standalone mobile app, available in both the Apple App Store and Google Play. At or around the same time as its mobile app launch, OpenAI adopted and began using a logo for its Sora software that appears to have been designed to create additional confusion in the marketplace rather than ameliorate it. The Sora logo is a "cute" anthropomorphic cloud, with large oval shaped eyes that feature star designs. Similarly, OverDrive's SORA logo and mascot is a "cute" anthropomorphic rocket whose eyes appear in a large oval shape and is often depicted with star designs. The parties' respective logos also use very similar, if not identical, shades of blue. OpenAI's Sora logo appears in the icon of its Sora mobile app and as a visible watermark on all videos generated by OpenAI's Sora software.

12. Since OpenAI's adoption of Sora, OverDrive has received an increasing number of questions and concerns about OverDrive's affiliation with, or connection to, OpenAI's Sora. Consumers have been actually confused between SORA and Sora—OpenAI's customers have contacted OverDrive with questions about Sora accounts and technical issues. And numerous online publications have flagged the risk of confusion between OverDrive's and OpenAI's "Sora" names and products.

13. OverDrive brings this lawsuit to protect consumers, especially children, and OverDrive's goodwill in the SORA trademark. If OpenAI's Sora app remains available, increasing instances of confusion among students, teachers, and librarians are not only likely but inevitable. OverDrive seeks both injunctive and monetary relief to address and prevent those ongoing and future instances of confusion and to compensate it for the harm it has suffered and continues to suffer as a result of OpenAI's unlawful conduct and the confusion it has already created.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b), and 15 U.S.C. § 1121, as this action arises under the Lanham Act.

15. This Court has supplemental jurisdiction over OverDrive's state law claims pursuant to 28 U.S.C. § 1367.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because OpenAI does business in this District, a substantial part of the events giving rise to OverDrive's claims occurred in this District, and a substantial part of property that is subject to the action is situated in this District. The injuries alleged herein from OpenAI's infringement of OverDrive's SORA trademark and the other unlawful conduct alleged herein foreseeably occurred in this District because OverDrive's headquarters is in this District.

**THE PARTIES**

17.     OverDrive is a public benefit corporation that is incorporated in the State of Delaware, with its principal place of business at One OverDrive Way, Cleveland, Ohio 44125. OverDrive is proud to be a certified B Corporation. Otherwise known as a "B Corp," a Certified B Corporation is a business certified to have demonstrated certain high standards established by the non-profit B Lab.

18.     On information and belief, OpenAI OpCo LLC is a Delaware limited liability company, with its principal place of business at 1455 3rd Street, San Francisco, California 94158, and is registered with the Ohio Secretary of State to do business in Ohio.

**FACTS**

**A.  OverDrive and Its SORA and SORA Icon Trademarks**

19.     OverDrive is highly regarded as a beacon of innovation in the digital content and technology industry, empowering millions around the globe with seamless access to books, audiobooks, and educational resources.

20.     OverDrive is home to a number of digital solutions that provide access to reading and education. Over the course of approximately 40 years, OverDrive has amassed the largest global collection of e-books, audiobooks, online magazines, and other digital media (including streaming video titles) for libraries, schools, government, and retailers worldwide. OverDrive is the market leader in borrowing electronic and digital media and content from libraries.

21.     From integrating AI-driven recommendations to supporting classroom learning, OverDrive continues to push boundaries, making digital learning more engaging, personalized, and powerful than ever before.

22.     Founded in 1986 in Cleveland, Ohio, Steve Potash, an attorney, had a vision to simplify access to information and initially focused on digitizing law books. As the internet and digital publishing matured in the 1990s, OverDrive shifted its mission toward broader digital content distribution, recognizing the transformative potential of e-books and online media.

23.     OverDrive's flagship application is LIBBY®, which offers access to public library collections of electronic books, audiobooks, and digital magazines. OverDrive has entered into thousands of agreements with authors, publishers, agents, and public libraries to make borrowing digital books possible through the LIBBY app. Through LIBBY, anyone with a library card can access e-books, audiobooks, and magazines, all for free. Sign in, link your library card, borrow books electronically, and read—it is that simple.

24.     Simultaneously, OverDrive saw a need in the pre-K-12 education market for a similar tool for students, teachers, and staff. At the outset, OverDrive tried to adapt available tools to address this need. OverDrive ultimately identified that this market, however, required a specialized platform—SORA—to control content, provide confidence to districts, educators, and parents, and comply with specific regulatory and governance requirements, all to protect children. In August 2018, OverDrive launched the SORA app, a digital download platform for school libraries to provide pre-K-12 students access to digital titles and content.

25.     OverDrive collaborates with publishers, educators, and librarians to curate expansive collections that reflect the richness of the human experience. Since its launch in 2018, SORA has given students instant access to thousands of electronic books and audiobooks, from timeless classics to trending titles. The SORA platform is a trusted cornerstone in the digital transformation of countless public and academic institutions.

26. OverDrive chose the name "Sora," which means "sky" in Japanese, because we must "reach for the sky" to be a nation of readers. The color "sky-blue" is consistently associated with the SORA app.

27. Since OverDrive's launch of the SORA platform, it has used a friendly character (depicted immediately below, in the iOS icon for the SORA app (the "***SORA Icon***")), to personify its app to children. To consumers, the SORA Icon symbolizes the emboldening power that the SORA app can have on its consumers to reach new heights and accomplish milestones. For example, the SORA app offers features where children can earn achievements and milestones by reading for particular periods of time or amounts of books. In this way, the SORA Icon signifies a safe, helpful friend to help them learn and reach new heights.



28. After downloading the SORA app, students can simply log in using the account number and pin provided by their teachers and instantly access hundreds of age-appropriate e-books and other digital content on virtually any device. Students access *approximately a half-million titles or other content every single day*.

29. The SORA app levels the playing field by ensuring that every student—regardless of their background or means—has access to high-quality digital books, stories, music, curricula, and more.

30.     The SORA app is also built for the classroom. With tools like reading progress tracking, assignments, and notes, the SORA app seamlessly integrates into the learning environment such that teachers gain insight and students gain independence.

31.     OverDrive also has SORA training materials and educator resources on its website, including training webinars and how-to videos.

32.     Designed with students in mind, the SORA app's interface is clean, fun, and easy to navigate. In fact, it's "gamified" with reading achievements and personalized recommendations to keep learners motivated and curious.

33.     OverDrive has continuously used the SORA and SORA Icon trademarks for more than seven years for its digital reading platform through which pre-K-12 students are provided online access to their school libraries to enjoy age-appropriate e-books and audio books.

34.     In addition to its SORA platform, OverDrive offers KANOPY®, a streaming platform for educational films and documentaries. Schools and libraries that subscribe to KANOPY often promote it alongside SORA.

35.     In this way and others, OverDrive is an integrated media company, offering all three platforms, LIBBY, SORA, and KANOPY, together, alongside, or integrated with each other.

36.     Used in thousands of schools worldwide, the SORA app has earned accolades for its innovation and effectiveness. OverDrive's SORA app was named by Time Magazine as one of the best 100 inventions in 2019 and is currently used by at least 60,000 schools and millions of students. OverDrive's SORA app was also named a TECH & LEARNING BEST OF SHOW winner at both the 2022 and 2023 International Society for Technology in Education shows.

37. OverDrive has gone to great lengths to ensure that its SORA platform is safe for children. The platform includes a thoughtful set of parental controls designed to give responsible adults greater visibility and influence over their child's digital reading experience.

38. Before a student even logs into the SORA app, a parent or guardian can activate what's known as "Parent Mode." This mode is protected by a six-digit PIN, which ensures that only authorized individuals can access and manage the settings. Once inside Parent Mode, parents and guardians are granted a window into their child's reading world. They can view the full catalog of books available to their child, including those offered through the school's digital collection and any linked public libraries.

39. Parents and guardians can see which books their child has checked out, what they're currently reading, and what they've read in the past. This transparency helps parents and guardians stay engaged with their child's literary interests and habits. If a parent or guardian comes across a title or series they feel is not appropriate or simply not a good fit, they can take direct action. The SORA platform allows parents and guardians to lock content, effectively preventing the student from accessing those titles. This control is effective in tailoring the reading experience to align with family values and age-appropriate content.

40. SORA is a strong, arbitrary trademark that is well known by the relevant consumers.

41. OverDrive is the owner of United States Trademark Registration No. 6,777,234 on the Principal Register in the United States Patent and Trademark Office for the SORA trademark for use in connection with "downloadable mobile application providing schools and educators with access to digital content for their students, namely, e-books and audio books from their school libraries including fiction and nonfiction works on a variety of topics" in Class 9. The SORA

registration was issued by the USPTO to OverDrive on July 5, 2022, and is based on a first use in interstate commerce as early as August 2018. A true and correct copy of the registration certificate is attached hereto as **Exhibit A**.

42.     OverDrive's SORA Icon is also a strong and inherently distinctive trademark that is well known by the relevant consumers.

43.     OverDrive is and has been continuously using the SORA and SORA Icon trademarks in interstate commerce in the United States in connection with high-quality electronic school library software goods and services for accessing, viewing, and engaging with digital content since at least as early as 2018.

44.     OverDrive enjoys strong common law rights in the SORA and SORA Icon trademarks. These common law rights in the SORA and SORA Icon trademarks extend throughout the United States in connection with its downloadable and online non-downloadable software for students, faculty, and staff to access, view, and engage with digital content, including ebooks, audiobooks, read-alongs, picture books, magazines, digital comics, graphic novels, and more, from their school library, as well as related goods and services.

45.     OverDrive has already invested millions of dollars and continues to invest substantial sums of money, as well as time, effort, and creative talent, to advertise, promote, and sell its digital reading platform for school libraries and their students under the SORA and SORA Icon trademarks.

46.     As a result of the considerable time, effort, money, advertising, and promotion of the SORA trademark and its widespread and extensive use by OverDrive, OverDrive owns valid and subsisting federal statutory and common law rights to the SORA trademark.

47.     As a result of OverDrive's widespread, continuous, and exclusive use of the SORA Icon trademark to identify its electronic school library software goods and services and OverDrive as their source, OverDrive owns valid and subsisting common law rights to the SORA Icon trademark.

48.     As a result of OverDrive's widespread, continuous, and exclusive use and substantial investments of time, effort, and money in marketing, advertising, and promoting its electronic school library software goods and services under the SORA Icon trademark, the SORA Icon trademark has developed significant goodwill and consumer recognition.

49.     OverDrive's SORA and SORA Icon trademarks are distinctive to the consuming public, as well as to the relevant industries and other interested parties.

50.     OverDrive's SORA and SORA Icon trademarks have become widely and favorably known throughout the United States, and throughout the world. The SORA and SORA Icon trademarks serve as unique identifiers of OverDrive's award-winning school library digital reading platform.

51.     As a direct result of the considerable time, effort, money, advertising, and promotion of the SORA and SORA Icon trademarks by OverDrive and the widespread and extensive use of the platform throughout the United States and beyond, OverDrive has so far enjoyed a substantial amount of goodwill associated with the SORA and SORA Icon trademarks.

**B.  OpenAI**

52.     OpenAI is an artificial intelligence research and commercial company headquartered in San Francisco, California. OpenAI does business throughout the United States, including within the State of Ohio and this District.

53.     Founded in 2015 by Sam Altman, OpenAI has developed, licensed, and commercially released numerous AI models, applications, and tools, including ChatGPT, DALL-E text-to-image generation software, Whisper automatic speech recognition (ASR) system, and now Sora, a text-to-video model that generates realistic video clips from natural language prompts.

54.     Since its founding, OpenAI has been characterized as prioritizing speed and disruption over consideration of the rights of others.

55.     OpenAI has drawn ire for its *innumerable* violations of intellectual property. Business Insider wrote on October 17, 2025: "OpenAI is building a track record of using stuff it may not have the rights to use – and only backtracking once it hears from rights owners and their lawyers."[2]

56.     In the Summer of 2023, comedian Sarah Silverman filed a lawsuit against OpenAI alleging that OpenAI used a pirated copy of her book as training data for ChatGPT.

57.     On September 19, 2023, author John Grisham and The Authors Guild sued OpenAI for copyright infringement over the alleged unauthorized use of Mr. Grisham's and other authors' published works to train OpenAI's AI large language models.

58.     On December 27, 2023, The New York Times sued, among others, OpenAI, together with other affiliated parties, and Microsoft Corporation for copyright infringement over the alleged unauthorized use of published works to train OpenAI's ChatGPT. The lawsuit contends that millions of articles published by The Times were used to train OpenAI's automated chatbots that now compete with the news outlet as a source of reliable information.

59.     Now OpenAI is at it again, continuing to cross the line by incorporating even more third-party intellectual property without apparent care. On October 28, 2025, Baron App, Inc.,

---

[2] "How Many Times Can OpenAI say, 'Oops?'", BUSINESS INSIDER, available online at https://www.yahoo.com/news/articles/many-times-openai-oops-163152908.html.

d/b/a Cameo sued OpenAI in the Northern District of California for incorporating a new service called "Cameo" for personalized videos into OpenAI's Sora app. "Cameo" is the very name that Baron App, Inc., d/b/a Cameo asserts that it cultivated into a global brand for personalized videos.

### C.  OpenAI's Usurpation of SORA

60.     On or about February 14, 2024, OpenAI applied to register the Sora trademark (Ser. No. 98,405,663) with the USPTO for: "downloadable computer programs and downloadable computer software for generating videos and images; downloadable computer programs and downloadable computer software for creating, generating, and editing videos and images based on natural language prompts, visual prompts, text, speech, images, and/or video; downloadable computer programs and downloadable computer software for video and image recognition, processing, analysis, understanding, and generation; downloadable computer programs and downloadable computer software for editing, organizing, modifying, transmission, uploading, downloading, and sharing of videos, images, and audio-visual material; downloadable computer progrmas and downloadable computer software for creating and generating text-to-video and text-to-image" in Class 9.

61.     On February 15, 2024, OpenAI first released a set of AI-generated video samples and a research paper showcasing its new software, which it named "Sora."

62.     When naming its new app, OpenAI had a multitude of options to choose from. It could have chosen a name modeled after *its* flagship product, ChatGPT—something like VideoGPT. But OpenAI instead selected Sora—the very name that OverDrive has cultivated into a global brand for good, education, literacy, and equality of access to reading through years of dedicated stewardship and substantial investment.

63.    Over the next year, OpenAI prepared Sora for public access—it invited a select group of filmmakers, animators, designers, digital artists, and ***educators*** to test early versions of the Sora software. These individuals provided feedback and their insights helped shape Sora into a tool for each of their industries.

64.    On December 9, 2024, OpenAI made Sora available to ChatGPT Plus and Pro users in the United States and Canada.

65.    Then, on September 30, 2025, OpenAI debuted the Sora app—no longer just a feature embedded in one of its existing products, Sora became a platform —a social, creative space where users could generate, remix, and share AI-powered videos.

66.    OpenAI made the Sora app available for download in the Apple App Store on iOS as Sora. The app launched as invite-only, available initially in the US and Canada, with interested users needing a referral or waitlist approval to join.

67.    Within weeks, the app topped the Apple App Store charts. Indeed, when an iPhone user searches for "sora" in the Apple App Store, OpenAI's Sora is the top result.



68.     By October 30, 2025, OpenAI temporarily lifted the invitation requirement for users in the US, Canada, Japan, and South Korea.

69.     On or around November 4, 2025, OpenAI expanded the Sora app to Android and additional countries, including Taiwan, Thailand, and Vietnam.

70.     In the education trade channel, OpenAI's use of the Sora name, even in its initial, limited beta release, ***promptly resulted in confusion*** between OpenAI's Sora and OverDrive's SORA trademark.

71.     On the ***very day*** that OpenAI first announced its Sora software, OverDrive received ***immediate*** feedback from librarians and teachers concerned that OpenAI's Sora would confuse students who use OverDrive's SORA app in schools.

72.     Shortly after OpenAI released its Sora app to OpenAI's "Red Teaming Network" (the select group of invitees that test and help to further develop software) in mid-February 2024, a reporter e-mailed OverDrive to ask if he could do a story about OverDrive's "Sora identity crisis." "I'm not sure if I'm being original with this idea, but I'd like to chat about the Sora identity crisis your company has likely been going through since OpenAI's Sora hit the scene a few weeks ago. Whenever I search Sora, I see your company's app listed first. I'm guessing . . . there is a lot of confusion among customers."

73.     A School Library Media Specialist wrote to OverDrive on March 14, 2024, "I was so confused when I saw the headline that Sora would be available for free, only to realize that it's not your Sora."

74.     A Digital Media & Library Specialist in a California school district wrote to OverDrive on March 28, 2024, "OpenAI has a new feature called Sora. This program is being used in school districts, mine included. It is already causing problems and honestly, I worry that it will take away from people thinking of OverDrive's Sora."

75.     Their concerns are not hypothetical. Given the recent launch by OpenAI of Sora as a standalone mobile app, it is inevitable that teachers, librarians, and pre-K-12 students who are existing or prospective users of OverDrive's SORA app will encounter OpenAI's Sora app and experience confusion.

76.     As educators begin to experiment with and explore use of OpenAI's Sora software in classrooms, confusion will rise even more.

77.     And third party articles tout OpenAI's potential for positive impact in the education sector notwithstanding that half the pre-K-12 schools in the United States already use OverDrive's SORA app, and more use it every single day.

**D.  Efforts to Resolve the SORA Identity Crisis**

78.     OverDrive believes that it should not be necessary for educators, librarians, students, or anyone to "need to remember not to confuse [OpenAI's Sora] with OverDrive's K12 digital library tool of the same name," as one writer cautioned in a yahoo! Tech & Learning Article.[3] To the contrary, OverDrive believes that it is OverDrive's and OpenAI's shared responsibility to take action to prevent confusion among educators, librarians, students, and the public at large.

79.     Consequently, OverDrive sent letters to OpenAI and its lawyers as early as February 2024 urging OpenAI to change the name of its text-to-video software to something not confusingly similar to SORA.

80.     OverDrive, through counsel, informed OpenAI of OverDrive's prior and longstanding use of SORA for a digital app for students to access digital content from school libraries, as well as of its registration for the SORA trademark, the likelihood of confusion described herein, and the potential for OverDrive to suffer reputational harm due to a perceived association with OpenAI's app. A true and correct copy of OverDrive's February 23, 2024, letter to OpenAI is attached hereto as **Exhibit B**.

81.     In turn, OpenAI's lawyers responded that its Sora could peacefully coexist because of the significant differences in the function and purpose of OverDrive's SORA app and OpenAI's Sora software—namely, that OpenAI's Sora would not be used by schools, educators, or in the education sector generally—and in the way the parties used their respective trademarks in the market. A true and correct copy of OpenAI's March 1, 2024, response to OverDrive is attached

---

[3] *Sora: What Educators Need to Know About The Video Version of ChatGPT*, YAHOO!TECH, Feb. 26, 2024, https://tech.yahoo.com/general/articles/sora-educators-know-video-version-100049484.html.

hereto as **Exhibit C**, and OverDrive's March 13, 2024, reply to OpenAI is attached hereto as **Exhibit D**.

82.     OverDrive again wrote to OpenAI in December 2024, again expressing concern that OpenAI's Sora software appeared to be preparing to enter the educational market, and, in particular, marketed to pre-K-12 schools and libraries. OverDrive explained that confusion would ensue and made clear that both parties could not market "Sora"-named products to the same teachers, librarians, and pre-K-12 students. A true and correct copy of OverDrive's December 20, 2024, letter to OpenAI is attached hereto as **Exhibit E**.

83.     Even as recently as the beginning of this year, OpenAI maintained that there was no likelihood of confusion, pointing to OpenAI's use of Sora as a feature of its ubiquituous ChatGPT web-based software rather than as a standalone mobile app, and the different uses in the marketplace. It argued that OverDrive's use of SORA "is accompanied by a cartoon-style animated mascot" and OpenAI's Sora "has no mascot or independent logo," and "is not presented in a cartoon-y style." A true and correct copy of OpenAI's January 17, 2025, response is attached hereto as **Exhibit F**.

84.     Less than three weeks later, on February 3, 2025, OpenAI's application to register the Sora trademark was issued a refusal by the US Patent and Trademark Office based on a likelihood of confusion with OverDrive's pre-existing SORA registration and one other pre-existing SORA registration owned by a third party. In particular, the Examining Attorney explained that the parties' marks were identical and their respective goods and services were similar because they contain software for transmitting and accessing video content. In its August 2025 response, OpenAI deleted from its SORA trademark application the portions of its goods and services referring to "software for editing, organizing, modifying, transmission, uploading,

downloading, and sharing of videos, images, and audio visual material." The Examining Attorney subsequently withdrew the refusal and passed OpenAI's application to the next stage of the registration process: publication.

85.     Yet, OpenAI's Sora ***is*** software for editing, organizing, modifying transmission, uploading, downloading, and sharing of videos, images, and audio visual material.

86.     On information and belief, OpenAI only deleted this portion of its identification to avoid the Examining Attorney's finding and obtain a registration—not because this portion of the identification inaccurately described its Sora.

87.     When the application was published, OverDrive timely filed a notice of opposition to OpenAI's application with the Trademark Trial and Appeal Board. The opposition is currently pending.

### E.  OpenAI's Deliberate Efforts That ***Increase*** the Likelihood of Confusion

88.     Despite OverDrive's proactive efforts to address the anticipated harm resulting from OpenAI's use of Sora, on or around October 1, 2025, OpenAI began to use a cartoon-y mascot in conjunction with Sora and specifically directed its efforts toward the pre-K-12 educational technology market.

89.     On or about October 1, 2025, OpenAI also began to widely use a character (depicted immediately below) in connection with its Sora app ("***Sora Icon***").



90.     On information and belief, OpenAI intentionally adopted the Sora Icon because it is confusingly similar to the SORA Icon.

91.    OpenAI developed its Sora Icon after OverDrive objected to OpenAI's use of the name Sora.

92.    The Sora Icon includes numerous elements that overlap with the SORA Icon, including: an outer space theme; a blue color palette; a bubble-format character; ovular eyes; a friendly appearance; and highly similar stars that are used prominently in both designs.



93.    OpenAI has also specifically directed Sora to schools, educators, and children.

94.    OpenAI invited teachers, instructional designers, and ed-tech innovators to test OpenAI's Sora software and provide feedback.

95.    In January 2025, OpenAI released its Economic Blueprint report, whereby OpenAI advocated for generative AI to have a revolutionizing role in education.

96.    In March 2025, OpenAI launched NextGenAI, a consortium of 15 research institutions focused on transforming education and accelerating research, to which OpenAI committed access to support students, educators, and researchers.

97.    In July 2025, OpenAI announced the launch of the National Academy for AI instruction—an education initiative that will provide access to free AI training and curricula for all members, and priority access to OpenAI's technology and future tools, starting with pre-K-12 educators.

98.    OpenAI has promoted the use of custom GPTs (generative pre-trained transformer) for educational purposes, allowing professors and instructors to build AI tutors and course assistants, which can be loaded with course content and tailored to a specific learning goal.

99.    OpenAI offers multiple license subscriptions for ChatGPT and Sora to educational institutions.

**F.  Reputational Harm**

100.    There exists a certain, grave risk of reputational harm to OverDrive if the public perceives an association between OverDrive and OpenAI, believes that OverDrive and OpenAI are in business together sharing OverDrive's SORA trademark, or believes that they are in business together sharing two aspects of the same SORA trademark (one, a reader app, and two, a text-to-video app).

101.    OverDrive is beloved by educators, publishers, and authors not only for its technology, but also because OverDrive respects intellectual property rights, obtains appropriate permissions/licenses from publishers and authors, ***and pays them*** to distribute their ebooks and audiobooks.

102.    For years, OverDrive's singular priority and objective with SORA has been to protect children from inappropriate, harmful, and dangerous content. OverDrive's SORA platform places child safety at the heart of its design, offering a secure, age-appropriate, and controlled reading environment that prioritizes protection without compromising access to learning.

103.    From the moment a student logs into the SORA app, the app's architecture reflects a deep commitment to safeguarding young readers. The platform is built specifically for pre-K-12 schools, meaning every feature is tailored to the developmental and educational needs of children. Schools control the content available to students, ensuring that only age-appropriate content (e.g.,

ebooks, audiobooks, and read-alongs) are accessible. This curated approach prevents exposure to inappropriate material and reinforces a safe digital space for exploration and growth.

104.    SORA also empowers guardians through its Parent Mode, as described above.

105.    Behind the scenes, OverDrive also enforces strict privacy and data protection standards. Student accounts are managed through school systems, and personal data is handled with care, complying with educational privacy laws like the Family Educational Rights and Privacy Act and Children's Online Privacy Protection Act. This means children's information is never exploited or exposed to third parties for commercial purposes.

106.    Accessibility is another pillar of the SORA platform's child-first philosophy. The SORA app supports screen readers, and includes features like high contrast mode and "Read From Here" audio navigation. These tools ensure that children with visual impairments or learning differences can engage with content safely and comfortably.

107.    Even the user interface is designed with children in mind—simple, intuitive, and free from distracting ads or external links. Students can read at school, at home, or on the go, but always within the boundaries set by their educators and guardians.

108.    OverDrive's commitment to child safety through the SORA platform is not just a feature—it is a philosophy. Every decision, from content curation to parental oversight and accessibility, reflects OverDrive's belief that children deserve a digital reading environment that is as safe as it is enriching.

109.    OpenAI, both as a company and as to the philosophy it adopts in developing and distributing its technology products, could not be more different from OverDrive. OpenAI has faced mounting scrutiny over how its AI systems interact with and impact children and teenagers.

110.    In *several* instances, OpenAI's tools have been alleged to contribute to a child's suicide.[4] Although OpenAI has purportedly taken steps to introduce safety measures, it nonetheless acknowledges "breakdowns" in guardrails can still occur, raising questions about the reliability of its safety systems.[5]

111.    Other criticism centers on its age verification and access controls. While OpenAI has introduced age prediction and restrictions on sensitive queries, enforcement remains imperfect. Teenagers can still access adult-level content or bypass safeguards, especially when using OpenAI's tools outside of school settings. Unlike platforms with strict identity verification, OpenAI's systems rely on user honesty and passive detection, which is not sufficient to protect vulnerable users.

112.    Still more criticism focuses on OpenAI's transparency and accountability. OpenAI's safety updates seemingly only follow public backlash or legal pressure, rather than proactive engagement. For example, the rollout of parental controls came only after a wrongful death lawsuit, suggesting a reactive rather than preventative posture.[6]

113.    And OpenAI is widely recognized in the press as an intellectual property infringer with products that were indiscriminately trained on third party intellectual property without obtaining *any* permissions and without paying *any* copyright owners, leaving OpenAI susceptible

---

[4] Rob Kuznia, Allison Gordon, Ed Lavandera, *'You're not rushing. You're just ready:' Parents say ChatGPT encouraged son to kill himself,* CNN, Nov. 6, 2025, https://www.cnn.com/2025/11/06/us/openai-chatgpt-suicide-lawsuit-invs-vis; Rhitu Chatterjee, *Their teenage sons died by suicide. Now, they are sounding an alarm about AI chatbots,* NPR, Sept. 19, 2025, https://www.npr.org/sections/shots-health-news/2025/09/19/nx-s1-5545749/ai-chatbots-safety-openai-meta-characterai-teens-suicideMatt O'Brien, *Parents of teens who died by suicide after AI chatbot interactions testify to Congress*, ASSOCIATED PRESS, Sept. 16, 2025, https://apnews.com/article/ai-chatbot-teens-congress-chatgpt-character-ce3959b6a3ea1a4997bf1ccabb4f0de2.
[5] *Helping people when they need it most*, OPENAI, Aug. 26, 2025, https://openai.com/index/helping-people-when-they-need-it-most/.
[6] Scarlett Evans, *OpenAI Rolls Out Parental Controls Following Lawsuit,* AI BUSINESS, Sept. 9, 2025, https://aibusiness.com/responsible-ai/openai-rolls-out-parental-controls-following-lawsuit.

to countless charges of copyright infringement that plague OpenAI's ChatGPT, not to mention fostering widely reproduced biases, such as racial and gender stereotypes.

114. The copyright infringement complaints filed so far against OpenAI allege that OpenAI's existing AI products and tools (namely, ChatGPT) use publishers' and authors' copyrighted works without permission and without payment have been widely reported and may be discovered through legal and nonlegal media alike.

115. OpenAI's Sora product is being positioned as a video version of OpenAI's ChatGPT product.

116. On information and belief, OpenAI maintained the same practices as it did for ChatGPT and robbed publishers, authors, filmmakers, actors, studios, and others indiscriminately to train Sora.

117. OpenAI's continued use of the Sora trademark in connection with its AI product erodes the goodwill OverDrive has built in the SORA brand. As OpenAI's public reputation is further tarnished as a result of copyright infringement lawsuits, OverDrive's SORA app will also be pulled down in equal measure through a perceived association and affiliation with OpenAI.

118. Consumers will logically assume the two "Sora" apps (OverDrive's and OpenAI's) are related or are the same. School-age children and others cannot tell the difference between them. A System Librarian from a school in New York wrote to OverDrive on February 29, 2024: "On a separate note, that new Sora program is coming up higher in search results on google than your SORA. . . . We would prefer your SORA comes up first so the students do not get confused."

## G. **Incidents of Actual Confusion**

119.    OpenAI's infringing acts as alleged herein have resulted in actual confusion as evidenced by several misdirected communications from existing or prospective users of OpenAI's Sora software.

120.    In August 2025, a confused *OpenAI* Sora user mistakenly sent a technical support request to *OverDrive's* SORA support team:

> Hello Sora Support Team, I am experiencing an issue when using Sora. Every time I try to open a generated image, I always get the following error message: Oops there was an error '<unknown>: 'unexpected nullish null" Because of this, I cannot view the generated images at all. Here are the troubleshooting steps I have already tried: - Refreshing the page – Clearing cache and cookies – Using incognito mode – Switching to another browser – Updating Chrome to the latest version – Restarting my device. Unfortunately, the problem still persists. Device details: [Omitted] I have attached screenshots of the error and my device/browser information to help with troubleshooting. Could you please assist me in resolving this issue? Thank you in advance.

121.    In August 2025, an OverDrive customer inquired of an OverDrive employee:

> Are you still our representative for Sora? I'm deeply upset and concerned that Open AI has a Sora app as well – theirs is for 'creating' videos and graphics. You are not affiliated with that, correct? Does Overdrive plan to respond to this use of the Sora name? It is confusing for educators, students, and families.

122.    OverDrive has also received negative Google Play reviews from individuals who were confused about the source and nature of the parties' respective SORA apps:



123.    A key topic at the recent 2025 American Association of School Librarians ("**AASL**") National Conference & Exhibition was the concern school librarians had "about students clicking on the wrong Sora." At the conference, an educator reported that their district had to rename the SORA app as "OverDrive Reading" in their catalog to avoid students clicking on the wrong icon. And another reported that they may have to remove SORA to avoid students accessing Sora.

124.    At least one school district has sent out a newsletter to parents regarding the specific risks to students accessing OpenAI's Sora app and not OverDrive's SORA app.

### H.  OpenAI's Sora is Harmful for Children and Harms SORA

125.    OpenAI's video-generation tool Sora is considered dangerous for children due to at least: the ability to create perfect deepfakes to cyberbully and harass those depicted; the ability to exploit and sexually exploit the likenesses of children; its addictive design; data privacy risks; and the blurring of reality.

126.    OpenAI boasts that its Sora software can produce the most realistic videos of any individual's image, likeness, and voice.

127.    The New York Times wrote the following of Sora: "The absurd videos rapidly became stranger and more disturbing. . . . I saw realistic-looking footage of famous people saying words that had never crossed their lips — Martin Luther King Jr. declaring, "I have a dream that they release the Epstein files"; Tupac Shakur claiming to be living in Cuba. . . . Today, though, we

are in danger of being buried under an avalanche of fakes so deep that it creates an entire alternative reality."[7]

128.　Sora has already been used to create deepfakes—highly convincing fake videos—of mass shootings, bombings, and other disturbing content.[8] This practice can have devastating and irreversible psychological consequences for the victims.

129.　Common Sense Media is a non-profit organization founded in 2003 to inform parents about media and technology for children. Common Sense Media reports that OpenAI's Sora poses unacceptable risks to children, explaining that Sora exposes users, particularly teens, to unacceptable risks form harmful and dangerous content.

130.　Common Sense Media *recommends that teens do not use the app*. "Sora represents a significant leap in AI Video generation, but its safety systems have not kept pace with its power," said Common Sense Media Senior Director of AI Programs Robbie Torney. "Between its lack of meaningful safety guardrails, the potential for deepfakes, and its blurring of fact and AI-generated fiction, the platform poses unacceptable risks for teens. Parents should be concerned about their teens using this platform – we recommend that teens don't use it."[9]

131.　An Instagram post had this to say about OpenAI's Sora: "Experts are warning of a rise in sexploitation and CSAM (child sexual abuse material), bullying and harassing,

---

[7] Dara Kerr, *OpenAI launch of video app Sora plagues by violent and racist images: 'The guardrails are not real'*, THE GUARDIAN, Oct. 4, 2025, https://www.theguardian.com/us-news/2025/oct/04/openai-sora-violence-racism; Bobbie Johnson, *What Is Sora Slop For, Exactly?*, THE NEW YORK TIMES, Oct. 19, 2025, https://www.nytimes.com/2025/10/19/opinion/ai-sora-slop.html; Esther Shittu, *Why OpenAI Won't Pull Sora 2After Plea From Public Citizen,* Nov. 13, 2025, https://aibusiness.com/generative-ai/why-openai-won-t-pull-sora-2; Katie Notopoulos, Sora might have a 'pervert' problem on its hands, BUSINESS INSIDER, Oct. 21, 2025, https://www.businessinsider.com/sora-video-openai-fetish-content-my-face-problem-2025-10

[8]; TMZ Staff, *Sora A.I. Video Exposes Netflix Star's Chest, Company Says They're Working on It*, yahoo!tech, Oct. 17, 2025, https://www.yahoo.com/entertainment/celebrity/articles/sora-video-exposes-netflix-stars-210045246.html

[9] *Common Sense Media Report Finds ChatGPT and Sora Pose Risks to Teens Despite Safety Features*, COMMON SENSE MEDIA, Oct. 23, 2025, https://www.commonsensemedia.org/press-releases/common-sense-media-report-finds-chatgpt-and-sora-pose-risks-to-teens-despite-safety-features.

misinformation, reputational harm, and the complete erosion of trust in authentic content. The implications are enormous, incredibly dangerous, and potentially violent."[10] Moreover, OpenAI's Sora is designed as a social network, a feed-based interface, similar to TikTok, which is optimized for high engagement. This can lead to addictive use patterns that negatively impact a student's well-being, sleep, and academic performance.[11] OpenAI's Sora also permits strangers (sometimes anonymously) to comment and private message children users.

132.    As well-known as OverDrive's SORA mark is, and as successful a company that OverDrive is in the pre-K-12 school library market, OverDrive has only a fraction of the resources and reach of OpenAI which, on information and belief, has a valuation of $500 billion and is the world's most valuable privately held company. As such, consumers discovering OverDrive's SORA platform for the first time are likely to mistakenly believe that OverDrive's platforms are sponsored, endorsed, or otherwise affiliated with OpenAI or its Sora software.

133.    Due to this imbalance, OpenAI's use of Sora also threatens to overwhelm OverDrive in the marketplace and the goodwill in SORA that OverDrive has spent years cultivating. Additionally, given OpenAI's disregard for the intellectual property rights of others and questionable business tactics, OpenAI's use of Sora is highly likely to tarnish OverDrive's SORA mark.

**COUNT I**
**FEDERAL TRADEMARK INFRINGEMENT**

134.    OverDrive incorporates by reference all of the facts stated in Paragraphs 1 through 133 of this Complaint as if fully rewritten herein.

---

[10]    Melissa Urban (@melissau), *The dangers of Sora 2 AI,* INSTAGRAM, Oct. 14, 2025, https://www.instagram.com/reel/DPy762zkSEw/?hl=en.
[11] Ben Woods, The 'TikTok of AI' – why OpenAI's Sora 2 will disrupt social media, MIDIA RESEARCH, Oct. 9, 2025, https://www.midiaresearch.com/blog/the-tiktok-of-ai-why-openais-sora-2-will-disrupt-social-media.

135.     OpenAI's use of the SORA trademark in commerce constitutes infringement of OverDrive's SORA trademark, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

136.     OpenAI's use of Sora is likely to cause confusion, mistake, or deception as to the source, origin, affiliation, association, or sponsorship of OverDrive's and OpenAI's goods and services. As a result of OpenAI's unauthorized use of the SORA trademark, the public is likely to mistakenly believe that OpenAI's goods and services have been authorized, endorsed, offered, sponsored, or approved by, or are affiliated with or originate from OverDrive and/or that OverDrive's goods and services have been authorized, endorsed, offered, sponsored, or approved by, or are affiliated with or originate from OpenAI.

137.     By these acts, OpenAI has infringed OverDrive's federally registered SORA trademark in violation of 15 U.S.C. § 1051, *et seq.*

138.     OpenAI's unlawful conduct as set forth herein has been and continues to be willful, deliberate, and in bad faith with the intent to cause confusion, mistake, and deception.

139.     These violations have irreparably damaged OverDrive, and it has no adequate remedy at law. Unless enjoined, OpenAI's unlawful conduct will continue, further injuring OverDrive and causing confusion.

140.     On information and belief, OpenAI has received substantial revenues and profits as a result of its unlawful conduct, to which OverDrive is entitled, and OverDrive has also suffered damages as a result of such unlawful conduct, for which OpenAI is responsible.

141.     OverDrive is therefore entitled to all of the remedies available under the Lanham Act, including injunctive relief, an accounting of OpenAI's profits, actual damages, costs, and attorneys' fees pursuant to 15 U.S.C. §§ 1116 and 1117.

142.     OpenAI will continue to carry out such unlawful conduct and be unjustly enriched unless enjoined by this Court.

## <u>COUNT II</u>
## FEDERAL UNFAIR COMPETITION – SORA

143.     OverDrive incorporates by reference all of the facts stated in Paragraphs 1 through 142 of this Complaint as if fully rewritten herein.

144.     OpenAI's distribution, advertising, marketing, and promotion of its Sora software constitutes use of a false designation of origin and misleading description and representation of fact that OpenAI's "Sora" app originates from or is authorized by, or is otherwise associate with, OverDrive, when in fact it is not.

145.     As a result of OpenAI's unauthorized use of the SORA trademark, the public is likely to be deceived, misled, and confused as to the origin, source, sponsorship, association, approval, or affiliation of OpenAI's goods and services, or that OpenAI's goods and services are distributed, authorized, endorsed, or sponsored by OverDrive, or that OpenAI is in some way affiliated with or sponsored by OverDrive, or vice-versa.

146.     By the acts alleged herein, OpenAI has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

147.     On information and belief, OpenAI's unlawful conduct as set forth herein has been and continues to be willful deliberate, and in bad faith with the intent to cause confusion, mistake, and deception.

148.     These violations have irreparably damaged OverDrive, and it has not adequate remedy at law. Unless enjoined, OpenAI's unlawful conduct will continue, further injuring OverDrive and confusing the public.

149.    On information and belief, OpenAI has received substantial revenues and profits as a result of its unlawful conduct, to which OverDrive is entitled, and OverDrive has also suffered damages as a result of such unlawful conduct, for which OpenAI is responsible.

150.    OverDrive is therefore entitled to all of the remedies available under the Lanham Act, including injunctive relief, an accounting of OpenAI's profits, actual damages, costs, and attorneys' fees pursuant to 15 U.S.C. §§ 1116 and 1117.

**COUNT III**
**FEDERAL FALSE DESIGNATION OF ORIGIN, FALSE DESCRIPTION, AND UNFAIR COMPETITION – SORA ICON**

151.    OverDrive incorporates by reference all of the facts stated in Paragraphs 1 through 150 of this Complaint as if fully rewritten herein.

152.    Without authorization from OverDrive, OpenAI has adopted and continues to use the infringing Sora Icon in connection with the distribution, advertising, marketing, and promotion of its Sora software in commerce in such a manner to falsely designate the origin of OpenAI's goods and services and confuse the public by suggesting that those goods and services are sponsored by or affiliated with OverDrive, in violation of 15 U.S.C. § 1125(a).

153.    In addition, OpenAI's use of the infringing Sora Icon falsely and/or misleadingly describes and represents the nature and function of OpenAI's Sora software by suggesting it is "child friendly" and comparable to OverDrive's SORA platform, thereby creating a false association or false affiliation with OverDrive and its market-leading SORA platform, in violation of 15 U.S.C. § 1125(a).

154.    OpenAI's use of the infringing Sora Icon on or in connection with its Sora software was done with notice and full knowledge that such use was not authorized or licensed by the OverDrive. OpenAI has used and continues to willfully use the infringing Sora Icon with the intent to confuse, mislead, or deceive existing and prospective SORA users and members of the general

public as to the origin, source, sponsorship, or affiliation of OpenAI's software, and with the intent to trade on OverDrive's reputation and goodwill.

155.    As a result of OpenAI's unauthorized use of the Sora Icon, the public is likely to be deceived, misled, and confused as to the origin, source, sponsorship, association, approval, or affiliation of OpenAI's goods and services, or that OpenAI's goods and services are distributed, authorized, endorsed, or sponsored by OverDrive, or that OpenAI is in some way affiliated with or sponsored by OverDrive, or vice-versa.

156.    By the acts alleged herein, OpenAI has violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and OpenAI's use of a trademark identical or confusingly similar to OverDrive's SORA Icon trademark constitutes a false designation of origin and unfair competition.

157.    On information and belief, OpenAI's unlawful conduct as set forth herein has been and continues to be willful deliberate, and in bad faith with the intent to cause confusion, mistake, and deception.

158.    These violations have irreparably damaged OverDrive, and it has not adequate remedy at law. Unless enjoined, OpenAI's unlawful conduct will continue, further injuring OverDrive and confusing the public.

159.    On information and belief, OpenAI has received substantial revenues and profits as a result of its unlawful conduct, to which OverDrive is entitled, and OverDrive has also suffered damages as a result of such unlawful conduct, for which OpenAI is responsible.

160.    OverDrive is therefore entitled to all of the remedies available under the Lanham Act, including injunctive relief, an accounting of OpenAI's profits, actual damages, costs, and attorneys' fees pursuant to 15 U.S.C. §§ 1116 and 1117.

## COUNT IV
## VIOLATIONS OF THE OHIO DECEPTIVE TRADE PRACTICE ACT

161.    OverDrive incorporates by reference all of the facts stated in Paragraphs 1 through 160 of this Complaint as if fully rewritten herein.

162.    OpenAI's activities constitute unfair or deceptive trade practices or acts within the meaning of the Ohio Deceptive Trade Practice Act (the "ODTPA"), codified at Ohio Rev. Code, § 4165.01 *et seq.*

163.    As alleged herein, OpenAI has caused a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval of OpenAI's Sora software by OverDrive in violation of Section (A)(2) of § 4165.02 of the ODTPA.

164.    As alleged herein, OpenAI has caused a likelihood of confusion or misunderstanding as to the affiliation, connection, or association of OpenAI's Sora app with OverDrive's SORA app in violation of Section 2(A)(3) of § 4165.02 of the ODTPA.

165.    As alleged herein, OpenAI has implicitly represented that OpenAI's app has the sponsorship of OverDrive, approval of OverDrive, or the affiliation or connection with OverDrive that OpenAI's app does not have in violation of the ODTPA.

166.    As alleged herein, OpenAI has engaged in conduct that creates a likelihood of confusion or misunderstanding in violation of the ODTPA.

167.    OverDrive has been injured as a result of OpenAI's unlawful and unauthorized deceptive trade practices by lessening of the goodwill that OverDrive's SORA and SORA Icon trademarks have with the relevant consumers and the public at large.

168.    As a result of OpenAI's unlawful and unauthorized deceptive trade practices, OpenAI has caused and will continue to cause substantial and irreparable harm to OverDrive and to the public for which there is no adequate remedy at law. OpenAI unjustifiably benefited from

said unlawful acts and will continue to carry out such unlawful conduct unless enjoined by this Court.

## COUNT V
## TRADEMARK INFRINGEMENT UNDER OHIO LAW

169.    OverDrive incorporates by reference all of the facts stated in Paragraphs 1 through 168 of this Complaint as if fully rewritten herein.

170.    The aforesaid conduct of OpenAI constitutes trademark infringement under the common law of the State of Ohio.

171.    On information and belief, OpenAI's acts of trademark infringement have been willful.

172.    OverDrive has been injured as a result of the foregoing acts by causing OverDrive to lose business or by lessening of the goodwill that OverDrive's SORA trademark and SORA has with the relevant consumers and the public at large.

173.    As a result of OpenAI's acts of trademark infringement, OpenAI has caused and will continue to cause substantial and irreparable harm to OverDrive and to the public for which there is no adequate remedy at law. OpenAI has unjustifiably benefited from said unlawful acts and will continue to carry out such unlawful conduct unless enjoined by this Court.

## COUNT VIII
## UNFAIR COMPETITION UNDER OHIO LAW

174.    OverDrive incorporates by reference all of the facts stated in Paragraphs 1 through 173 of this Complaint as if fully rewritten herein.

175.    The aforesaid conduct of OpenAI constitutes unfair competition under the common law of the State of Ohio.

176.    On information and belief, OpenAI's acts of unfair competition have been willful.

177. OverDrive has been injured as a result of the foregoing acts by causing OverDrive to lose sales or by lessening of the goodwill that OverDrive enjoys with the relevant consumers and the public at large.

178. As a result of OpenAI's acts of unfair competition, OpenAI has caused and will continue to cause substantial and irreparable harm to OverDrive and to the public for which there is no adequate remedy at law. OpenAI has unjustifiably benefited from said unlawful acts and will continue to carry out such unlawful conduct unless enjoined by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, OverDrive prays that this Court enter judgment in its favor as follows:

(a) That OpenAI be adjudged to have willfully infringed OverDrive's federal trademark rights in the SORA mark conveyed by U.S. Trademark Registration No. 6,777,234 in violation of Lanham Act § 32(1), 15 U.S.C. § 1114(1);

(b) That OpenAI be adjudged to have willfully infringed the SORA trademark, with full knowledge of OverDrive's rights in the SORA trademark;

(c) That OpenAI be adjudged to have engaged in federal unfair competition, in violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a)(1)(A);

(d) That OpenAI be adjudged to have committed deceptive trade practices under the Ohio Uniform Deceptive Trade Practice Act and to have committed these deceptive trade practices willfully and with knowledge that they would be deceptive;

(e) That OpenAI be adjudged to have engaged in trademark infringement and unfair competition under Ohio law;

(f) That, pursuant to 15 U.S.C. § 1116 and Section (A)(1) of § 4165.03 of the ODTPA, the Court preliminarily and permanently enjoin OpenAI, their agents, employees, attorneys and all persons in active concert or participation with them, from directly or indirectly

using the SORA trademark or any other mark, trade name, word or name similar to the SORA trademark that is likely to cause confusion, mistake, or to deceive, including without limitation by further operating any business under Sora;

(g)    That OpenAI be required to formally abandon with prejudice any and all of its applications to register the SORA trademark or any trademark consisting of, incorporating, or containing the SORA trademark or any counterfeit, copy, confusingly similar variation, or colorable imitation thereof on any state or federal trademark registry;

(h)    That OpenAI be required, pursuant to 15 U.S.C. § 1118, to deliver up and destroy all packaging, labels, signs, brochures, advertisements, promotional items, and any other media, documents or things in the possession, custody, or control of OpenAI bearing the SORA trademark (or any confusingly similar mark), and all means of making same;

(i)    That OpenAI be required, pursuant to 15 U.S.C. § 1117(a), to pay OverDrive the actual damages it has suffered as a result of OpenAI's trademark infringement and unfair competition, and disgorge any profits therefrom, and that OpenAI be required, pursuant to 15 U.S.C. § 1117(b), to pay OverDrive three times the amount of actual damages or profits suffered by them by virtue of the willful nature of OpenAI's illegal acts;

(j)    That, pursuant to Section 4165.03(B), the Court award OverDrive its reasonable attorneys' fees by virtue of OpenAI's willful engagement in a deceptive trade practice knowing it to be deceptive, or alternatively, pursuant to 15 U.S.C. § 1117(a), that the Court declare this an exceptional case and award OverDrive its reasonable attorneys' fees;

(k)    That, pursuant to 15 U.S.C. § 1117(a), the Court award the full costs of this action and interest to OverDrive; and

(l)    That the Court grant such other and further relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), OverDrive hereby demands a trial by jury on all issues so triable in this action.


Dated: November 19, 2025     Respectfully submitted,

            */s/ Mark E. Avsec*
            Mark E. Avsec (0064472)
            mavsec@beneschlaw.com
            Angela R. Gott (0082198)
            agott@beneschlaw.com
            Lidia Mowad (0097973)
            lmowad@beneschlaw.com
            BENESCH, FRIEDLANDER,
             COPLAN & ARONOFF LLP
            127 Public Square, Suite 4900
            Cleveland, Ohio 44114-1284
            Telephone: (216) 363-4500
            Facsimile: (216) 363-4588

            *Attorneys for Plaintiff*
            *OverDrive, Inc.*